UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRODERICK A. MOORE,

Petitioner,

v.                                                    Case No. 19-cv-973-pp

UNITED STATES OF AMERICA,

Respondent.

**ORDER DENYING PETITIONER'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE UNDER 28 U.S.C. §2255 (DKT. NO. 1), DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY AND DISMISSING CASE**

On July 20, 2017, following a four-day trial and after deliberating about two hours, a jury returned a verdict finding the petitioner guilty of one count of motor vehicle robbery and one count of brandishing a firearm during a crime of violence. United States v. Broderick Moore, Case No. 15-cr-201 (E.D. Wis.), Dkt. Nos. 148, 155. At trial, both the victim, id., dkt. no. 155 at 3, and the petitioner's co-defendant (Sean Harvey), id., dkt. no. 225 at 73-106, identified the petitioner as the person who took the car at gunpoint. The court sentenced the petitioner to 192 months' (sixteen years) incarceration. Id., Dkt. Nos. 195, 196. The petitioner appealed, id., dkt. no. 204; his sole appellate argument focused on the inconsistency between the court's oral pronouncement of the supervised release term and conditions and the written version, id., dkt. no. 233 at 1. The parties filed a joint motion to remand to correct the

1

inconsistencies, and the court amended the judgment on February 22, 2019. Id., Dkt. No. 232.

On January 10, 2023, the court denied the petitioner's *pro se* motion for a new trial, finding that he had not established that his purported "new evidence" (letters from Demonn Williams) was material rather than merely impeaching or cumulative. Id., Dkt. No. 318 at 28. The court also found that the petitioner had not established that the "new evidence" would have led to an acquittal. Id. at 31. The petitioner appealed that order. Id., Dkt. No. 319. The Seventh Circuit dismissed that appeal for lack of prosecution. Id., Dkt. No. 324.

Meanwhile, a few months after the court amended the judgment in the criminal case, the petitioner filed this motion under 28 U.S.C. §2255, asking the court to vacate, set aside or correct the sentence imposed. Moore v. United States of America, Case No. 19-cv-973 (E.D. Wis.), Dkt. No. 1. The petitioner argues that his trial counsel was ineffective in multiple ways. The petitioner has not demonstrated that an evidentiary hearing is necessary. The court will deny the petitioner's §2255 motion and decline to issue a certificate of appealability because his arguments are not supported by the record and because he has failed to meet his burden of proof.

## I.     Motion to Vacate, Set Aside or Correct Sentence

### A.     Petitioner's Motion (Dkt. No. 1)

The petitioner argues ineffective assistance of counsel under the Sixth Amendment, citing various "errors" that he believes resulted in the guilty

verdict. <u>Moore</u>, Case No. 19-cv-973, Dkt. No. 1. He argues that (1) trial counsel (Attorney Dan Sanders) should have called six additional witnesses at trial (Marquell Baker, John Fears, Robert A. Ellis, Lamar Blunt, Nacarrente Carr and William Griggs); (2) trial counsel failed to investigate the timeline of travel between the carjacking and the various other locations involved; (3) counsel at the preliminary hearing (Attorney Jim Toran) failed to procure a videotape from the Milwaukee teacher education association building which would have caught the carjacking on video and proven the petitioner innocent; and (4) trial counsel failed to investigate witnesses and statements provided to him before trial by investigator Bill Kohl. <u>Id.</u> at 4-9. The petitioner admits that these claims were not raised on appeal; he states that his counsel failed to raise them. <u>Id.</u>

B.    <u>Respondent's Answer</u> (Dkt. No. 8)

The respondent answered, arguing that the court should summarily dismissed the third ground, and that the remaining grounds were so undeveloped that the court should treat them as having been waived. Dkt. No. 8. As to the third ground, the respondent asserts that although the petitioner argued that Attorney Toran should have promptly obtained the video from the Milwaukee Teachers Education Association, the petitioner also asserted that this video would have been saved for only fourteen days from the date of the carjacking—July 16, 2015. Dkt. No. 8 at 4-5. The government pointed out that the petitioner was not arrested until August 3, 2015—more than fourteen days after the carjacking—so even "the best attorney in the world, with a small army of investigators, could not have obtained this evidence in time to help the

3

defense because the evidence no longer existed." Id. As for the other grounds, the respondent argued that the petitioner had failed to provide even a "thumbnail sketch of how these witnesses would have testified," and failed to explain what counsel should have done with the statements provided to investigator Kohl. Id. at 6-7.

The respondent adds that the second ground may be the weakest of the claims because witness Sean Harvey "offered testimony that was consistent with the cellular telephone location data introduced at trial" and the petitioner's argument was supported by nothing more than some Google Map documents. Id. at 7. Although the respondent asserted that the court could deny the §2255 motion on the record alone, it suggests in the alternative that an evidentiary hearing would allow trial counsel to explain his strategic choices. Id. at 7, 8, n.2.

C.      Petitioner's Brief in Support (Dkt. No. 15)

The petitioner filed the §2255 motion on July 8, 2019. The court did not screen the petition until about a year later, on July 20, 2020. Dkt. No. 4. In the screening order, the court required the respondent to answer or otherwise respond, then laid out a briefing schedule giving the petitioner forty-five days from the date of the answer to file a brief in support of his motion and giving the respondent forty-five days to file an opposition brief. Id. at 6. The respondent sought additional time to answer, dkt. no. 6, and the court extended the deadline for answering to October 19, 2020, dkt. no. 7. The

4

respondent filed an answer on October 15, 2020. Dkt. No. 8. But the petitioner did not file his brief within forty-five days.

In January 2023—over two years later—the court realized that the petitioner hadn't filed a brief in support of his petition. On January 10, 2023, the court issued an order to show cause reminding the petitioner that in July 2020, it had ordered him to file a supporting brief within forty-five days of the respondent's answer. Dkt. No. 9. The court ordered that the petitioner must file his supporting brief in time for the court to receive it on February 7, 2023. Id. at 4. The petitioner asked for an extension of that deadline, dkt. no. 10, and asked the court to appoint him a lawyer, dkt. no. 11. The court granted the request for an extension of time, giving the petitioner a deadline of July 28, 2023 by which to file his brief; it denied his request to appoint counsel. Dkt. No. 14. The petitioner timely filed his brief on May 1, 2023. Dkt. No. 15.

The petitioner first argues that the photo array violated his due process rights because the government gave the victim his name before showing her the pictures. Dkt. No. 15 at 6-9. He says that the victim had given conflicting descriptions of him and that the lineup occurred after she'd "become aware" of his name and viewed photos of him online. Id. at 2. He asserts that the detectives "coached" the identification by giving the victim his name prior to the lineup. Id. at 6. He says that his trial attorney was aware of this issue but did not attempt to suppress the lineup or the victim's in-court identification of him. Id. at 8. He also argues that the police "withheld the fact that the police provided the [petitioner's] name to the victim prior to the lineup." Id. at 9. He

says that this not only tainted the photo lineup but implicated "exculpatory evidentiary issues under <u>Brady v. Maryland</u>."[1] <u>Id.</u> The petitioner believes that if his trial attorney had filed a pretrial motion challenging the identification, it would have had a "dramatic effect." <u>Id.</u> at 10. He says such a motion would have had a "strong likelihood to alter the outcome at trial as the only evidence at trial against the [petitioner] was the witness' identification and the inculpatory statements by Sean Harvey." <u>Id.</u>

The petitioner separately argues that his lawyer should have asked the court to suppress any in-court identification of him due to the alleged tainted photo line-up. <u>Id.</u> at 10-11. He says that because there was no physical evidence—fingerprints, DNA, *etc.*—connecting him to the crime, "the eyewitness identification of the Defendnat [sic] by the victim was the cornerstone of the government's case in chief." <u>Id.</u> at 11. He asserts that his lawyer's failure to investigate the circumstances of the photo line-up, and failure to seek suppression of the in-court identification, "should be found to be ineffective." <u>Id.</u>

Next, the petitioner argues that counsel failed to preserve security videos of the crime scene, which was near the Milwaukee Teacher's Association building at 5130 W. Vliet Street. <u>Id.</u> He asserts that that building had external surveillance cameras that were able to view the alleged carjacking scene, as well as record the victim's vehicle driving away from that scene." <u>Id.</u> In support of this assertion, the petitioner attached a letter dated August 7, 2017 from the

---

[1] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

executive director of the Milwaukee Teachers' Education Association to Felicia Hughes, advising that that building had "multiple security cameras" installed, both outside and inside. Dkt. No. 15-1 at 26. That letter states, "The video from our cameras are not saved after 14 days." Id.

The petitioner says that at his initial appearance, he asked Attorney James Toran to secure "any and all surveillance camera videos from the area around the alleged crime scene, including the Milwaukee Teacher's Association building, as the videos would be exculpatory in nature because they would demonstrate that the [petitioner] was not present during the carjacking and that the [petitioner] was not driving the victim's car after the carjacking." Id. He says he made this same request of his trial attorney, Dan Sanders. Id. He says that it is undisputed that neither attorney tried to obtain "this material, exculpatory evidence." Id. He asserts that "the evidence shows that the video surveillance of the incident existed and both defense counsel and the government failed to investigate and procure this material exculpatory evidence." Id. at 12. He asserts that "[t]here would be no better evidence than the security camera videos." Id. And he says that his lawyers not only did not obtain those videos, but "failed to investigate and learn what videos did exist, and why the police did not review them or obtain them." Id. He urges the court to find that his lawyers were ineffective in failing to obtain the videos, "which would have exonerated the [petitioner] entirely." Id. at 13.

The petitioner next argues that counsel failed to investigate witnesses he identified prior to trial. Id. at 13. He says he gave counsel a list of material

7

witnesses, but that only two of them testified at trial (Nijah Brown and Meggan Fears, who both testified that the petitioner was at Ms. Brown's house during the carjacking). Id. He says he also had listed John Fears—who also was at Ms. Brown's house "and further corroborated that the [petitioner] was there during the carjacking." Id. The petitioner also argues that his lawyer was "aware of numerous witnesses that would have materially impeached the testimony of a government key witness, Sean Harvey." Id. He begins with another of his co-defendants, Robert Ellis, who did not testify for either side at trial; he asserts that Ellis's "story of events was materially different than that of Sean Harvey." Id. He maintains that Ellis's testimony would have "impeached" Harvey "and cast doubt on the government's case." Id. He says that Ellis also could have testified about a letter that Harvey sent to this court in which Harvey recanted the story he'd told police. Id.

Next the petitioner discusses Marquell Baker, whom he says purchased the carjacked Toyota Avalon after the offense and who was not called by either side to testify. Id. at 13. Referring to an "Exhibit 9,"[2] the petitioner says that Baker's statement to the police contradicted Sean Harvey's—particularly that Baker told the police that Harvey "was not alone when Harvey brought Mr. Baker the victim's Toyota, and Mr. Baker stated that he did not know [the petitioner]." Id. at 13-14. The petitioner says that there were phone records supporting Baker's version of the events. Id. at 14. Later in his brief, he says

---

[2] There is no Exhibit 9 attached to the petitioner's brief.

that Baker "maintained that the [petitioner] was not involved in the carjacking or sale of the victim's vehicle." Id. at 16.

The petitioner maintains that his lawyer "failed to investigate and present at trial numerous inmates who were detained with both Sean Harvey and Robert Ellis;" he says that those individuals would have testified that "Sean Harvey changed his mind about his letter to the district court judge only after his attorney told him that the letter may adversely affect his plea deal" and that Ellis and Harvey were not being truthful about the petitioner's involvement in the crime. Id. In support of this argument, he points to a letter from a Demonn Williams dated December 20, 2017, in which Williams says he was incarcerated with Robert Ellis and had received a letter from Sean Harvey. Dkt. No. 15-1 at 22. The letter says that Harvey told the author what sentence he had received, that Ellis demanded to see the letter and that, when shown the letter, Ellis said that that was "unbelievable" and that "Brod" wasn't the person who committed the robbery. Id. The author said that although Ellis had admitted that "Brod" had nothing to do with the robbery, the author did not know who "Brod" was until he was in a different facility. Id. The petitioner contends that "[t]hese witness statements and trial testimony would have undoubtedly impeached the statements and testimony of Sean Harvey." Id. And he says that [i]t should be undisputed that the un-investigated and uncalled witnesses, especially Marquell Baker and Robert Ellis, would have bolstered the [petitioner's] defense." Id. at 16. He says that without using the testimony of Baker and Ellis, as well as "Demonn Williams, John Fears, Lamar

9

Blunt, Naccarente Carr, and William Grigg," he was not able to test the prosecution's case. Id. at 17. He concludes by asking the court to find that "defense counsel's failure to investigate, interview, and present these witnesses is unprofessional conduct falling below the standard of a reasonably competent attorney practicing under prevailing professional norms." Id.

The petitioner next argues that in his police statements, Harvey said the petitioner had committed "numerous prior uncharged crimes" and that these allegations were part of Harvey's trial testimony. Id. at 18. He asserts that the government introduced that testimony to show that the petitioner had the character and propensity to engage in carjacking with Harvey, in violation of Fed. R. Evid. 404(b)(1). Id. The petitioner alleges that his trial counsel did not file a pretrial motion to exclude this evidence and did not object to the testimony at trial. Id. at 19. He asserts that the evidence was used to "convince the jury that the [petitioner] had a propensity to engage in carjackings, even though the [petitioner] had never allegedly committed a carjacking offense in the past." Id. He contends that this evidence was "overwhelmingly prejudicial," and that his lawyer's failure to object constituted ineffective assistance of counsel. Id. He also says his lawyer should have challenged the fact that the government didn't provide the required notice of its intent to use this evidence. Id. at 20.

Finally, the petitioner argues that counsel failed to "effectively" challenge the sufficiency of the evidence. Id. He specifically points out that phone records showed the victim called the police at 10:21 a.m. and Harvey tried to call her

10

bank to obtain her banking passwords at 10:48 a.m., yet Harvey testified that during that time, he drove the car to Marquell Baker's residence, then to the petitioner's residence, then to a gas station and then to the victim's residence. Id. The petitioner asserts that using Google Maps (which he attached to his brief, Dkt. No. 15-1 at 28-31), it would have taken forty minutes to go all those places, not counting the time it would have taken to interact with people at those locations. Id. at 20-21. He says that his lawyer should have cross-examined Harvey on that timeline and impeached him by calling Baker and Ellis. Id. at 21. He reasons that had the tainted lineup and identification been excluded, the only evidence left was the testimony of his cooperating co-defendant, Harvey. Id. He alleges that Harvey had "an enormous incentive to testify against anyone" due to his plea agreement (which the petitioner argues suggested a sentence that was "about one-fourth (1/4) of any co-defendant"). Id. And he says that Harvey's testimony directly contradicted statements Ellis and Baker made to the police, the physical and digital evidence and Harvey's own sworn statement to the undersigned judge. Id. at 21-22. He maintains Harvey's "credibility was thin at best," and that counsel should have used multiple forms of evidence to impeach Harvey. Id. at 22.

> D. Respondent's Brief in Opposition (Dkt. No. 22)

After receiving two extensions of time, dkt. nos. 19, 21, the respondent filed its brief in opposition to the petitioner's motion, dkt. no. 22. The respondent addresses each of the petitioner's arguments, but begins by pointing out that the petitioner "is simply wrong about the facts." Dkt. No. 22

11

at 7. The respondent emphasizes that there is no evidence that police provided the petitioner's name to the victim prior to the presentation of the photo array. Id. It says that both the victim and the officer who presented the array testified that there was no identifying information presented for any of the photographs. Id. (citing Case No. 15-cr-201, Dkt. Nos. 224 at 77-79; 225 at 10-58). The respondent points to the victim's testimony that *after* she identified the petitioner in the photo array presented on July 28, 2015, she learned—from a reporter—that someone had been arrested. Id. (citing Case No. 15-cr-201, Dkt. No. 224 at 115-18). The respondent contends that the photo array procedure was not tainted and that there was no basis to for defense counsel to move to preclude or strike the victim's in-court identification. Id. at 7. It adds that defense counsel clearly recognized the importance of the victim's in-court identification by "thoroughly and diligently cross-examin[ing] the victim concerning her identification of [the petitioner]." Id. at 8 (citing Case No. 15-cr-201, Dkt. No. 224 at 92-95). It says that defense counsel highlighted the victim's description of the carjacker's complexion and build and highlighted differences between her testimony on direct examination and on the 911 call. Id. at 8. The respondent also points out that the victim had a clear opportunity to observe the petitioner, who was unmasked and in broad daylight, before he pulled the gun on her. Id. (citing Case No. 15-cr-201, Dkt. No. 224 at 112-114).

With respect to defense counsel's alleged failure to preserve surveillance video, the respondent recounts that the petitioner himself provided evidence that any video that may have been recorded by the cameras on the teachers'

12

association building was destroyed after fourteen days. Id. at 9 (citing Dkt. No. 15 at 11). It reminds the court that the carjacking occurred on July 16, 2015, but the petitioner was not arrested until August 3, 2015—eighteen days later. Id. The respondent reasons that by the time the petitioner showed up for his initial appearance in state court, any video would have been destroyed, and that it was "long gone" by the time Attorney Sanders appeared in the federal case on November 25, 2015. Id.

As for the list of witnesses whom the petitioner believes counsel should have called to testify, the respondent says that the petitioner has provided insufficient information about Lamar Blunt, Naccarente Carr, William Grigg or Edguardo Rivera. Id. at 10. The respondent points out that aside from saying that these witnesses would have "materially impeached Sean Harvey," the petitioner has not explained who they were, when they were detained, whether their testimony would have been admissible or whether counsel would have known of their existence at the time of trial. Id. It points out that although the petitioner provided a statement from Demonn Williams, he did not provide statements from Blunt, Carr, Grigg or Rivera. Id. at 10-11.[3]

The respondent argues that John Fears's testimony would have been problematic for the defense because Fears told a detective that the petitioner had admitted he was with "another guy" when the petitioner took the car. Id. at 11 (citing Ex. A, Dkt. No. 22-1). The respondent argues that based on this

---

[3] The respondent explains that Rivera was interviewed by law enforcement, and that his statements corroborated much of Harvey's version stating that Ellis had forced Harvey to sign the recantation letter. Dkt. No. 22 at 10 n.5.

statement, it was not ineffective for trial counsel to decide not to call Fears as a witness. Id.

As for Ellis, the respondent acknowledges that the petitioner says that Ellis's testimony would have impeached Harvey and would have provided information about the recantation letter Harvey sent this court. Id. at 11-12. But it points out that "Ellis also implicated [the petitioner] as participating in the carjacking both during his interviews with the government and in his plea agreement." Id. at 12 (citing Dkt. No. 15 at 7). The respondent argues that it was not "plainly deficient lawyering" for counsel to decline to call Ellis. Id.

The respondent explains that Baker bought the carjacked Toyota; it asserts that Baker's testimony would have done little for the defense because, despite stating that he did not see the petitioner or Ellis during the sale of the carjacked Toyota, Baker acknowledged that he "could not see if there were other occupants inside the car because the windows were 'tinted.'" Id. at 13 (citing Case No. 15-cr-201, Dkt. No. 15-1 at 18-20). The respondent says that Baker's testimony is consistent with Harvey's testimony that the tint on the "getaway vehicle" was so dark that a person could not see through the front window and that the petitioner was in the front seat. Id. at 12 (citing Case No. 15-cr-201, Dkt. No. 225 at 106). The respondent also recounts that Harvey testified that he and Ellis were together during the sale, which is consistent with the cell phone location data for both cell phones. Id. at 12 (citing Case No. 15-cr-201, Dkt. No. 226 at 111-12). According to the respondent, "based upon objective evidence," Baker's statement was false, providing a strategic reason

14

for the defense not to call him. Id. at 13. The respondent adds that Baker would have been subject to cross-examination about his heroin trafficking convictions and convictions for operating a vehicle without the owner's consent. Id. The respondent recounts that before the trial, it filed a notice under Federal Rule of Evidence 609, stating that it would seek to impeach Baker with his felony convictions for one count of possession with intent to deliver heroin >3-10 grams, two counts of manufacture/deliver heroin >3-10 grams, one count of manufacture/deliver heroin >10-50 grams, and two counts of driving or operating a vehicle without the owner's consent. Id. (citing Case No. 15-cr-201, Dkt. No. 142).

The respondent argues that the petitioner's arguments in his motion for a new trial, and the court's findings in its order denying that motion, shut down any argument that Attorney Sanders should have called Demonn Williams. Id. at 13-14 (citing Case No. 19-cv-973, Dkt. No. 22 at 14). It recounts that Williams's statements "surfaced in December 2017, well *after* the trial." Id. at 14. It recounts that this court found that such evidence would be, at best, cumulative impeachment evidence and that it did not warrant a new trial when the government's evidence was otherwise strong enough to convict without it. Id. The respondent also points out that the petitioner has not shown that the evidence was available at the time of the trial and, in fact, has argued just the opposite. Id. The respondent asserts that that means that counsel was not deficient in failing to call a "(then) unknown witness." Id.

15

The respondent argues that the petitioner also is incorrect about the alleged "prior bad acts" that he alleges came in through Harvey's testimony. Id. The respondent asserts that Harvey did not testify about the petitioner's prior crimes—charged or uncharged—or bad acts more generally. Id. at 15. The respondent says that although Harvey may have discussed the petitioner's other activities in *debriefs with the government*, Harvey's trial testimony was limited to the petitioner's activities on the day of the carjacking. Id. at 15 (citing Case No. 15-cr-201, Dkt. Nos. 22 at 15-198; 318 at 9-13).

As for the argument that counsel failed to effectively challenge the sufficiency of the evidence, the respondent says that one cannot disregard what this court has referred to as the "compelling" and "powerful" evidence at trial "that the [petitioner] was the person who put the gun to the victim's head and threatened to shoot her if she did not have her keys." Id. at 16 (citing Case No. 15-cr-201, Dkt. No. 318 at 32). The respondent says that defense counsel was faced with a victim who made a very strong identification of the petitioner, the fact that Harvey had implicated the petitioner, objective cell-site data that corroborated Harvey and that another witness, Tajuan Green, had testified that the petitioner admitted to committing the crime. Id. The respondent argues that defense counsel's cross of Harvey was "lengthy, vigorous and well-prepared." Id. at 17. It asserts that defense counsel offered a theory of the defense supported by two alibi witnesses and that was not entirely inconsistent with the government's record evidence. Id. The respondent points out that the defense's theory would have required the jury to discredit the government

16

witnesses and believe Nijah Brown, Meggan Fears and the petitioner himself. Id. It concludes by stating, "The fact that counsel's strategy did not result in an acquittal . . . is not a basis for finding that his substantial efforts to obtain one" constituted ineffective assistance. Id.

E.     Petitioner's Reply Brief (Dkt. No. 26)

In his reply brief, the petitioner argues that the record reflects "the extreme level of deficient performance" by his trial counsel that led to his conviction. Dkt. No. 26 at 2. The petitioner believes the respondent "has essentially made [his] case for him" and he thanks the respondent for pointing out the "the flaws in [the petitioner's] trial counsel's inability to provide competent representation." Id. at 2-3. The petitioner reiterates his main points: that his attorney failed to collect the security camera footage, failed to challenge the allegedly tainted lineup and in-court identification and failed to investigate that the petitioner's phone was nowhere near the scene. Id. at 4. Addressing the respondent's assertions that the petitioner failed to meet his burden, the petitioner argues that "had counsel did his job, these questions are moot as they would have been answered on the record, at the time of trial." Id. The petitioner insists that "it is not [the petitioner's] job to do his counsel's job." Id.

The petitioner tries to clarify that he is not attacking the trial but rather the effectiveness of his counsel's performance. Id. at 6. He maintains that there was a "reasonable probability that the results would have been different if [the petitioner] had chosen to represent himself at trial," saying "he could not have

17

done any worse." Id. at 7. The petitioner asks the court to overrule the government's objections, issue an order for an evidentiary hearing and appoint him counsel. Id.

## II.  Analysis

A petitioner seeking relief under §2255 must allege either that the sentence violated the Constitution or laws of the United States, that the court was without jurisdiction, that the sentence exceeded the maximum authorized by law or that the sentence is otherwise subject to collateral attack. 28 U.S.C. §2255(a). "Relief under § 2255 is available 'only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice.'" United States v. Coleman, 763 F.3d 706, 708 (7th Cir. 2014) (quoting Blake v. United States, 723 F.3d 870, 878–79 (7th Cir. 2013)).

The petitioner raised his ineffective assistance of counsel claim for the first time in the §2255 motion—a year and a half or so after the court imposed his sentence. Ordinarily, the doctrine of procedural default would bar his claim because the petitioner did not raise it with this court or in the Seventh Circuit. But the Seventh Circuit generally allows a petitioner to raise an ineffective assistance of counsel claim for the first time in a §2255 motion "regardless of whether the petitioner could have raised the claim on direct appeal." Delatorre v. United States, 847 F.3d at 845 (quoting Gaylord v. United States, 829 F.3d 500, 506 (7th Cir. 2016)).

18

To prevail on an ineffective assistance of counsel claim, the petitioner must show that (1) his counsel's performance was deficient and (2) that he was prejudiced by deficiencies in his counsel's performance. Strickland v. Washington, 455 U.S. 668, 687 (1984). To show deficient performance, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688. Prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Surmounting Strickland's high bar is never an easy task" and "the Strickland standard must be applied with scrupulous care." Harrington v. Richter, 562 U.S. 86, 105 (2011).

Not every petitioner who files a §2255 motion is entitled to an evidentiary hearing. Boulb v. United States, 818 F.3d 334, 339 (7th Cir. 2016). A hearing is unnecessary when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. §2255(b). For that reason, the Seventh Circuit has said that a district court need not hold an evidentiary hearing "if the petitioner makes allegations that are vague, conclusory, or palpably incredible, rather than detailed and specific." Bruce v. United States, 256 F.3d 592, 597 (7th Cir.2001) (quotation marks omitted).

A.      In-Court Identification of the Petitioner

The record undermines the petitioner's argument that the victim's in-court identification somehow was tainted by an impermissible photo array. The petitioner suggests—without identifying any evidence to substantiate the

19

claim—that a law enforcement officer told the victim the petitioner's name before she viewed the array.

On the first day of trial, the victim testified that she learned the petitioner's name *after* he had been taken into custody. The victim testified that she was driving her husband to his softball game on the morning of July 16, 2015. Case No.15-cr-201, Dkt. No. 224 at 62-63. She explained that a "nice, young-looking, dressed nice young man" knocked on the window of her car to ask her for money. <u>Id.</u> at 64-65. She said that she had a clear view of the man's face that morning and that he was not wearing a mask, hat or sunglasses. <u>Id.</u> at 66. She testified that there did not seem to be anything wrong with the situation, and she and the young man had a 15-20-second conversation before he jumped into the car and told her to give him the keys or he would shoot her. <u>Id.</u> at 65-67.

The first photo array was shown to the on the afternoon of the carjacking; victim did not identify anyone out of that array. <u>Id.</u> at 77. On July 25, 2015, officers showed her a second photo array, while she was sitting outside of her home in a lawn chair. <u>Id.</u> The officer handed her photos one at a time and told her to say yes or not to the photos; she identified one photo that was "definitely the guy who put a gun to [her] head in the car." <u>Id.</u> at 77-78. She testified that the officers made no suggestions to her as to who they wanted her to pick. <u>Id.</u> at 78. The victim testified that she was "extremely confident" at the time she made the identification, and did not waiver or hesitate to identify the petitioner. <u>Id.</u> at 79. She testified that she was in good

20

health at the time and had good eyesight. Id. at 80. Although two years had passed at the time of the trial, the victim testified that she could "definitely" identify the petitioner as the man who carjacked her on July 16, 2015. Id. at 80.

On cross-examination, defense counsel questioned the victim about discrepancies between the description she gave to officers and in the 911 call and her description in court. Id. at 94-95. The victim testified that the second array took place around July 28, 2015 and that someone called to tell her they had someone in custody. Id. at 106. She did not believe that officers told her who they had in custody. Id. The petitioner was arrested on August 3, 2015—days *after* the victim selected him from the second photo array.

On redirect, the victim testified that during the incident she looked at the carjacker's face and tried to focus on what he was saying. Id. at 112. She said that she felt calm and did not suspect that there was anything wrong. Id. at 113. On recross, she testified that a reporter had come to her house a couple of weeks later and told her that Harvey's case had been dismissed in the state court. Id. at 115-16. The following exchange between defense counsel and the victim makes clear that the victim learned the petitioner's name *after* she had identified the petitioner in the second photo array:

Q: And then after you did the second photo array—

A. Uh-huh.

Q. —and you picked out the person who you believed was [the petitioner]—

A. Yes.

Q. —you learned from the police that he was arrested, right?

A. Yes.

Q. And then you went on the county website, correct?

A. Right.

Q. And you looked on the inmate locator. Correct?

A. Uh-huh.

Q. And you looked up his name, [the petitioner] right?

A. Right.

Q. And you looked at his pictures there.

A. Right.

Q. Looked at his pictures that were shown to you in the photo array?

A. I'm sorry, say that again?

Q. Was it the picture in the county website of the picture that was shown to you in the photo array?

A. Very similar to it, yes.

Q. But you looked at it anyway.

A. Right.

Q. Did you tell anybody that you did that?

A. I told my husband. I said, "Here's what the guy looks like." And I says, "And I know that's him." And my husband said, "Sure, let me see it. Let me see it." So I showed him the picture.

Q. But before you looked him up, you didn't know his name—

A. Uh-huh.

Q. You just learned it over from—did the media tell you or

Case 2:19-cv-00973-PP    Filed 04/24/26    Page 22 of 36    Document 27

did you hear it on the news or did the police call you?

A. I don't recall who told me, how I found out about it, but when I got the name—I don't know if that TV station told me or not. I don't know.

Q. How did you know how to look up on the website?

A. Because I've had dealings with other things that I go on there and check people out. So I have—

Q. Okay.

Id. at 117. The victim testified that she learned the petitioner had been arrested and learned his name by doing a search *after* the second photo array.

Officer Litwin, who was present at the second photo array, testified about the double-blind folder method the officers used to present the second photo array. Case No.15-cr-201, Dkt. No. 225 at 10. He explained that the City of Milwaukee uses software to house all the mugshots taken from arrestees; the officer selects the most recent photograph and then the software culls through the most recent mugshots for persons most closely fitting the general physical description. Id. at 11. Litwin testified that the officers had followed the standard procedures with the July 28, 2015 second photo array by selecting the most current booking photograph of the petitioner and five fillers. Id. at 13. He printed eight-by-ten photos of the six individuals without any markings or other notations. Id. at 17. He did not know what folder the petitioner's photo was in. Id. at 18. The officer handed the victim eight folders (the last two are kept empty to make sure the victim does not feel pressure to identify someone when handed the sixth folder). Id. at 18.

Applying the first prong of <u>Strickland</u>, there is nothing in the record to suggest that either photo array was "tainted." Nothing in the record shows that any officer told the victim the name of the petitioner before she identified him from the second photo array. Rather, the testimony established that the victim learned the petitioner's name after his arrest by looking him up on the county's in-custody locator website. And defense counsel vigorously cross-examined the victim about her descriptions to the police, about the photo arrays and about how she had searched for the petitioner's name after learning of his arrest.

If the petitioner is arguing that counsel should have filed a motion to suppress any in-court identification because the victim had found his name through an internet search, the petitioner must prove that such a motion would have been meritorious. <u>Long v. United States</u>, 847 F.3d 916, 920-21 (7th Cir. 2017). An in-court identification is admissible if there is "an independent basis of reliability." <u>United States v. Sanders</u>, 708 F.3d 976, 984 (7th Cir. 2013). To determine whether there was an independent basis for reliability, the court considers:

> 1) the witness' opportunity to view the suspect at the scene of the crime; (2) the witness' degree of attention at the scene; (3) the accuracy of [her] pre-identification description of the suspect; (4) the witness' level of certainty in the identification; and (5) the time elapsed between the crime and the identification.

<u>United States v. Rogers</u>, 387 F.3d 925, 938 (7th Cir. 2004). The victim testified that she had an opportunity to view the petitioner in the daylight under calm circumstances and that he wasn't wearing anything that would have obstructed her view of his face. She said that she focused on his face and that

24

she was "extremely confident" in her identification. Less than two weeks passed between the carjacking and her identification. She further testified that she had learned the petitioner's name after his arrest and after she had identified him in the second photo array. If defense counsel had filed a motion to suppress the in-court identification (or made an oral motion to do so), the court would have denied it as being without merit. Because the petitioner has not satisfied either prong of Strickland, the court will deny the motion on this ground.

B.    Security Video

Next, the petitioner has argued that Attorney Toran and/or Attorney Sanders should have sought to preserve surveillance video from cameras at a building near the crime scene. The court observes that the petitioner has not even presented evidence that there was any video from those surveillance cameras. The letter from the executive director said only that there are cameras on the outside and inside of the building. The letter did not state whether those cameras were operating on the morning of the carjacking. It did not describe the "area" captured by the cameras. The petitioner assumes that because there were cameras on the building, those cameras must have captured the carjacking. But there is no evidence supporting that assumption.

More to the point, the executive director's letter—which the petitioner himself provided—reflects that even if the cameras were operating and even if they did capture the carjacking, the video did not exist by the time Attorneys Toran and Sanders began representing the petitioner. The executive director's

25

letter explained that although the association had multiple security cameras at their building, they did not save video from those cameras after fourteen days. Dkt. No. 15-1 at 26.

The carjacking occurred on July 16, 2015. The petitioner was not arrested until *eighteen* days later, on August 3, 2015. It was not until October 5, 2015—two and a half months after the carjacking—that Attorney James Toran appeared on behalf of the petitioner at his initial appearance on the criminal complaint in federal court. Case No.15-cr-201, Dkt. No. 2. On November 24, 2015, Magistrate Judge David Jones granted Attorney Toran's oral motion to withdraw, dkt. no. 34, and Attorney Sanders appeared for the petitioner on November 25, 2015, dkt. no. 35.

The petitioner has failed to allege any facts demonstrating that if there were surveillance videos taken by the cameras at the Milwaukee Teachers' Education Association, those videos still existed at the time the federal government filed charges against the petitioner.

C.    Potential Trial Witnesses

Next, the court turns to the petitioner's arguments that counsel was ineffective in failing to investigate and call several witnesses whom he says would have corroborated his alibi and/or undermined Sean Harvey's testimony. The petitioner says that counsel only called two of the witnesses at trial, Nijah Brown and Meggan Fears, to corroborate his alibi that he was at Brown's residence during the carjacking. Dkt. No. 15 at 13. He says that John Fears was also present at Brown's residence and could have further

26

corroborated his alibi. <u>Id.</u> He argues that other witnesses, such as Robert Ellis and Marquell Baker, would have undermined Harvey's testimony. <u>Id.</u> at 13. He also says that there were "numerous" persons detained with Harvey and Ellis who would have testified that Harvey changed his mind about a letter to a district court judge only after his attorney told him the letter would impact his plea deal and that Ellis and Harvey were not being truthful about the petitioner's role in the offense. <u>Id.</u> at 14.

If trial counsel failed to investigate or consider the potential testimony of any of these witnesses, his performance would have been deficient because an attorney owes his client a duty to make a reasonable investigation or at least to make a decision that no further investigation is necessary. <u>See</u> <u>Washington v. Smith</u>, 219 F.3d 620, 631 (7th Cir. 2000). But the record makes it impossible for the petitioner to meet his burden under <u>Strickland</u>. "[a] petitioner alleging that counsel's ineffectiveness was centered on a supposed failure to investigate has the burden of providing the court sufficiently precise information, that is, 'a comprehensive showing as to what the investigation would have produced.'" <u>Hardamon v. United States</u>, 319 F.3d 943, 951 (7th Cir. 2003) (quoting <u>United States <em>ex rel.</em> Simmons v. Gramley</u>, 915 F.2d 1128, 1133 (7th Cir. 1990)). "[E]ven incarcerated movants must demonstrate, with some precision, the content of the testimony [the potential witnesses] would have given at trial." <u>Kratz v. United States</u>, 79 F. App'x 932, 934 (7th Cir. 2003).

The petitioner first mentions John Fears. He argues that Fears would have confirmed that the petitioner was at his girlfriend's apartment at the time

27

of the carjacking. But on August 19, 2025, Fears provided a statement to police, telling the officer that the petitioner had said that he was with "another guy" when the petitioner took the victim's car. Dkt. No. 22-1 at 2. Fears also told the officer that he was not with the petitioner for any portion of the day on July 16, 2015. Id. If counsel had called Fears as a witness, Fears either would have contradicted the petitioner's version of events or been confronted with his August 19, 2025 statement that contradicted that version.

The petitioner also names Lamar Blunt, Nacarrente Carr and William Grigg as individuals who would have provided helpful testimony. Dkt. No. 15 at 17. Although it is possible that these are individuals who were detained with Harvey and/or Ellis, there is nothing in the record to suggest what they would have said, whether their testimony would have been admissible or whether trial counsel knew of their existence at the time of the trial. The petitioner has provided little to no information about the content of these individuals' proposed testimony; he simply alleges, in conclusory fashion, that without their testimony, "the [petitioner] was unable to subject the prosecution's case to the 'crucible meaningful adversarial testing . . . .'" Dkt. No. 15 at 17. Without some specific information about their proposed testimony, the petitioner cannot meet his burden of showing that there was a reasonable probability that the outcome of the trial would have been different.

The only witness for whom the petitioner has provided statements is Demonn Williams, and the court thoroughly addressed those statements in its order denying the petitioner's motion for a new trial. Case No. 15-cr-201, Dkt.

28

No. 318 at 29. The petitioner filed two handwritten letters from Williams dated December 20 and 21, 2017, in which Williams discussed what Harvey and Ellis allegedly said while in prison. Id. In his motion for a new trial, the petitioner argued that the letters constituted new evidence that he could not have discovered prior to December of 2017. Id. Dkt. No. 234 at 1. The court determined that Williams's testimony would have been hearsay that would not be admissible under any exception to the hearsay rule. Id., Dkt. No. 318 at 28-29. The court found the letters to be cumulative impeachment evidence (rather than material evidence) because the jury had heard (1) that Harvey had lied to police numerous times and (2) that he had signed the pretrial letter exonerating Ellis even though he told the jury that the information in that letter was not true. Id. at 29. Aside from the fact that counsel would not have been deficient for failing to investigate or call Williams because there is nothing to suggest that Williams's testimony was available at the time of trial (the petitioner has asserted that it was not available), the petitioner has not shown that Williams's testimony would have been admissible or that it would have changed the outcome of the trial.

That leaves Ellis and Baker. The petitioner argues that his counsel should have called Ellis to testify because Ellis's version of the events was "materially different" than Harvey's version. Case No. 19-cv-973, Dkt. No. 15 at 13. But during Ellis's February 24, 2017 plea colloquy—a hearing that took place months before the petitioner's July 2017 trial—Ellis implicated the petitioner. Case No. 15-cr-201, Dkt. No. 115. Ellis told this court, under oath,

that it was the petitioner's idea to steal the car, that the petitioner carjacked the victim and that the petitioner had participated in selling the stolen vehicle to another individual. Id. at 28-29. It further appears from the police interview attached to the petitioner's brief that on December 16, 2016—again, months before the petitioner's July 2017 trial—Ellis made a statement to Officer Litwin and Assistant United States Attorney Margaret Honrath, during which he made similar statements. Case No. 19-cv-973, Dkt. No. 15-1 at 6-10. The petitioner has not provided this court with any evidence to suggest that his counsel was deficient in deciding not to call Ellis under these circumstances, or that Ellis's testimony would have led to a different outcome.

As for Marquell Baker, the petitioner says that Baker's statement to police is "substantially in contrast to Sean Harvey's police statement and eventual trial testimony" because Baker stated that Harvey was alone when Harvey brought the victim's Toyota to Baker to sell and that Baker did not know the petitioner. Dkt. No. 15 at 13-14. The petitioner attached Baker's May 31, 2017 interview with Litwin and Detective Marco Salaam, which he says is Exhibit 9; the respondent has clarified that it was labeled as Exhibit 5. Dkt. No. 15-1 at 18-20. Baker told the officers that Harvey was alone inside the victim's Toyota Avalon when Harvey appeared at his house, but he said that when Baker dropped Harvey off at the gas station where Harvey had told Baker he was meeting up with Ellis, Harvey got into the front passenger seat of a car, but Baker could not see whether there were other occupants inside the car because the windows were tinted. Dkt. No. 15-1 at 19. Cell phone data records

30

introduced at trial established that Ellis was with Harvey at the time of the sale of the Toyota to Baker. Case No. 15-cr-201, Dkt. No. 226 at 111-12. Before the petitioner's trial, the respondent filed a notice under Rule 609 stating that if Baker were called to testify, it would impeach Baker with Baker's prior convictions for possession with intent to deliver heroin and for driving a vehicle without the owner's consent. Id. at 152. It would have been risky for defense counsel to call Baker, and the petitioner has not established that it was deficient performance on the part of his counsel not to investigate or call Baker or that the failure to call Baker was prejudicial.

Because the petitioner has failed to meet his burden under Strickland, the court will deny the motion on this ground.

D.      Other Acts Evidence under Rule 404(b)

The petitioner accuses trial counsel of failing to object to other bad acts about which Harvey testified. The court has reviewed Harvey's July 18, 2017 trial testimony. He testified about the activities on the day of the carjacking. Case No. 15-cr-201, Dkt. No. 225 at 60-138. Harvey's first mention of the petitioner was when he explained that he had talked with the petitioner on the morning of July 16, 2015. Id. at 72. Harvey said that he knew the petitioner through mutual friends and saw him daily during that summer. Id. at 73. According to Harvey, the petitioner called him the morning of July 16, 2015 to tell Harvey that the petitioner needed to have his car fixed and have a cell phone bill paid. Id. Harvey testified that the petitioner told Harvey that "he needed to bust a move," which Harvey understood to mean "[g]etting a car so

31

that he can sell it." Id. Harvey related that he and the petitioner had arranged to meet near 42nd and Capitol, that Ellis had picked Harvey up in a Honda Accord with very darkly tinted windows, that Harvey had gotten into the passenger seat and how Ellis had driven very fast to 42nd and Capitol to find the petitioner getting out of a Honda Civic. Id. at 74-76. He explained how the petitioner had gotten into the back seat of the car Ellis was driving. Id. at 77. Harvey described how the three went to the south side to steal some cars and that they were looking for cars that were left running, for keys that they could "snatch," "just looking for a vehicle that was easy to take." Id. at 78. Harvey described how they eventually pulled up behind the Toyota Avalon. Id. at 81. Harvey further described the petitioner's actions, and testified about seeing the petitioner approach the Toyota and draw the firearm. Id. at 83-85.

As Harvey testified about what happened immediately after the carjacking, he mentioned mutual friends who were "Bless Team Members," describing them as a "group of young adults or older adults that run around" selling drugs and stealing cars in Milwaukee. Id. at 113. When asked if the petitioner was a member of the Bless Team, Harvey replied "no." Id. The remainder of his testimony focused on the activities of the petitioner immediately before, during and after the carjacking. Harvey identified himself, Ellis and the petitioner in a photograph taken July 3, 2015. Id. at 127 (referring to Ex. 10J). Harvey also explained that there was a Toyota Solara belonging to the petitioner parked outside Harvey's house when the police were

32

there because he and the petitioner had been using the Solara to sell drugs the night before and Harvey had driven it home. Id. at 128.

The petitioner says Harvey alleged in his trial testimony that the petitioner had committed "numerous prior uncharged crimes" and that his counsel should have objected to the introduction of this evidence. Case No. 19-cv-973, Dkt. No. 15 at 18. Having reviewed Harvey's testimony, the court cannot find any testimony about the petitioner committing "prior uncharged crimes." The petitioner says that the government used such testimony to prove his propensity to engage in carjacking crimes. Id. at 20. But Harvey didn't testify about any prior crimes—charged or uncharged—by the petitioner, nor did he testify that the petitioner had engaged in other carjackings. When asked if the petitioner was a member of the Bless Team (a group associated with stolen cars), Harvey said no. Case No. 15-cr-201, Dkt. No. 225 at 113. Counsel cannot be deficient in failing to object to testimony that Harvey did not give.

E. Sufficiency of the Evidence

Finally, the petitioner did not challenge the sufficiency of the evidence on direct appeal. Perhaps he did not raise the issue because sufficiency challenges can succeed only "if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." United States v. Curtis, 324 F.3d 501, 505 (7th Cir. 2003). Although the petitioner isn't arguing that the evidence wasn't sufficient, he appears to be arguing that counsel could or should have done more to attack the sufficiency of the government's case. For example, he makes the same general references to the witnesses he believes

33

counsel should have investigated or called and repeats his allegations about the allegedly tainted photo array identification and in-court identification. The court has explained that neither of these alleged errors rose to the level of deficient performance or show a reasonable probability that the outcome of the trial would have been different.

The only new argument that the petitioner presents is his argument that his counsel was ineffective in failing to challenge Harvey's timeline of the events. Case No. 19-cv-973, Dkt. No. 15 at 20. According to the petitioner, phone records show that the victim called the police to report the carjacking at 10:21 a.m. Id. He says that phone records reflect that Harvey called the victim's bank at 10:48 a.m. to try to get access to her bank password. Id. The petitioner reasons that this means that in the twenty-seven minutes between the victim's 911 call and Harvey's call to her bank, Harvey would have had to drive to Baker's residence and sell the Avalon, then drive to the petitioner's residence to drop him off, then drive to the gas station to try to use the victim's credit cards and finally go to the victim's residence, where they stole the victim's second car. He asserts that Harvey's testimony that all those things could have happened in that short period is contradicted by Google Maps, which calculates that all those stops would have taken at least forty minutes "and that 40 minutes does not account for any time to 1) sell the car to Marquell Baker; 2) attempt to use the victim's bank cards at the gas station ATM; and 3) go into a store near [the petitioner's] neighborhood." Id. at 21.

34

There are several problems with this argument. First, the petitioner assumes that everything Harvey described happened between the moment of the 911 call and the moment of the bank call. But there is no evidence that the victim called 911 immediately as the robbery was occurring. It may have taken her time to get herself together before calling to report the crime. Second, the petitioner's support for this argument is some maps that he printed from Google Maps on July 18, 2019. These maps do not discredit Harvey's testimony—they do not reflect how fast the men were driving or how heavy the traffic was on the day of the carjacking. Third, and most important, defense counsel conducted a vigorous cross-examination of Harvey, covering his deal with the government, the fact that he had not been charged with stealing the victim's second car, the fact that he had lied multiple times and the inconsistencies in his testimony. Case No. 15-cv-201, Dkt. No. 225 at 139-185. And the government's case was strong—it included the victim's (confident) identification of the petitioner, Harvey's description of the petitioner's role in the offense and the corroborating evidence provided by cell-site data and phone records. The evidence was more than sufficient to support the conviction, and would have been even if defense counsel had tried question how the three could have gone to the various locations in the time the petitioner calculates.

There is no need for the court to conduct an evidentiary hearing. The court will deny the petitioner's §2255 motion.

## III. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2255 Proceedings, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A court may issue a certificate only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted). The court declines to issue a certificate of appealability because reasonable jurists could not debate that the petitioner is not entitled to *habeas* relief under 28 U.S.C. §2255.

## IV. Conclusion

The court **ORDERS** that the petitioner's motion to vacate, set aside or correct his sentence under 28 U.S.C. §2255 is **DENIED.** Dkt. No. 1.

The court **DECLINES TO ISSUE** a certificate of appealability.

The court orders that the case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 24th day of April, 2026.

BY THE COURT:

_____
HON. PAMELA PEPPER
United States District Judge

36